UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BREEZE SMOKE LLC,                              Case No. 2:25-cv-10184

     Plaintiff,                                    Hon. F. Kay Behm

v.                                             United States District Judge

SPEED WHOLESALE, INC. and
MKE VAPE WHOLESALE LLC,

     Defendants.

_____ /

**OPINION AND ORDER ON MOTION FOR DEFAULT
JUDGMENT AND PERMANENT INJUNCTION (ECF No. 19)**

## I.     PROCEDURAL HISTORY

Plaintiff Breeze Smoke LLC ("Breeze Smoke") filed a complaint on

January 17, 2025, against Defendants Speed Wholesale, Inc. and MKE

Vape Wholesale LLC ("Defendants") alleging trademark infringement of

a registered mark in violation of 15 U.S.C. § 1114, trade dress

infringement in violation of 15 U.S.C. § 1125(a), unfair competition and

false designation of origin in violation of 15 U.S.C. § 1125(a), and state

law claims for unfair competition and unjust enrichment.  ECF No. 1.

Plaintiff served the summons and complaint upon Speed Wholesale,

Inc. ("Speed Wholesale") on January 27, 2025, and upon MKE Vape

Wholesale LLC ("MKE") on January 28, 2025.  ECF Nos. 10, 11.  Fed. R. Civ. P. 4(h) provides that services upon corporations and unincorporated associations may be effected by any manner prescribed for individuals under Rule 4(e)(1), which in turn allows for service pursuant to the law of the state in which the district court is located.  In Michigan, Mich. Ct. R. 2.105(D)(1) allows service upon a corporation by serving a summons and a copy of the complaint on an officer or the resident agent personally or, alternatively, by serving a summons and a copy of the complaint on a director, trustee or person in charge of the office as well as sending a summons and a copy of the complaint by registered mail.  Plaintiff provided affidavits of service for Defendants through their respective registered agents and officers of the corporation.  *See* ECF No. 10, PageID.646; ECF No. 11, PageID.647.

Fed. R. Civ. P. 12(a)(1) provides that a defendant must provide an answer within twenty-one (21) days of being served with a summons and complaint.  The deadline for Speed Wholesale and MKE to serve an answer or otherwise respond to the complaint in this matter was February 18, 2025.  Upon the failure of Defendants to timely file a responsive pleading, Breeze Smoke filed requests for entries of default

against Speed Wholesale and MKE on March 27, 2025, and March 31, 2025, respectively.  ECF Nos. 13, 16.  Defaults were entered by the clerk of the court against Speed Wholesale on March 27, 2025, and MKE on April 1, 2025.  ECF Nos. 14, 17.  On May 16, 2025, Breeze Smoke moved for a default judgment against Defendants to seek permanent injunction against Defendants and monetary remedies from Defendants pursuant to Fed. R. Civ. P. 55(b)(2) and 15 U.S.C. §§ 1116, 1117.  ECF No. 19.  On July 9, 2025, the court held a hearing on Plaintiff's motion for a default judgment against Defendants. Following the hearing, the court directed Plaintiff to file supplemental briefs regarding estimation of lost profits and timesheets for reasonable attorneys' fees.  On July 31, 2025, Plaintiff filed a supplemental brief accompanied by declarations from the Plaintiff's Managing Member, Plaintiff's attorney of record, and Robert Riley, Chief Value Partner of the firm representing Plaintiff.  ECF Nos. 27-31.

For the reasons set forth, the court **GRANTS** Plaintiff's Motion for Default Judgment and Permanent Injunction.

## II.   FACTUAL BACKGROUND

Plaintiff Breeze Smoke LLC is a Michigan limited liability company whose business involves manufacturing and selling disposable electronic vaping devices ("BREEZE products") under the mark BREEZE and marks consisting of or containing the term "BREEZE" as the dominant and distinctive element. ECF No. 1, PageID.6 at ¶ 14. Breeze Smoke owns several United States Trademark Registrations for its BREEZE and BREEZE formative marks (collectively "BREEZE marks"), with priority dating back to 2014. ECF No. 1, PageID.9 at ¶ 20. The following is a list of Breeze Smoke's federally registered trademark numbers: 6,296,004, 6,296,005, and 7,561,762 for the mark BREEZE; 6,770,534 for the mark BREEZE PLUS; 6,976,563 for the mark BREEZE SMOKE; 6,992,438 for the mark BREEZE PRO; and 7,552,704 for the mark BREEZE ODOR. ECF No. 1, PageID.9-11. Breeze Smoke also owns Michigan State Trademark Registrations for the mark BREEZE, which were registered on August 13, 2020, and asserts use in commerce since at least as early as February 4, 2020. ECF No. 1, PageID.16 at ¶ 22. Breeze Smoke has consistently used its BREEZE marks on production and advertisement of its vaping products. ECF No. 1, PageID.17 at ¶¶ 26-29.

Along with its unique trademarks, Breeze Smoke has trade dress rights on its product packaging trade dress and product design (collectively "BREEZE trade dresses") in connection with its BREEZE PRO products.  ECF No. 1, PageID.19 at ¶¶ 33-34, PageID.21 at ¶¶ 43-44.  Breeze Smoke allegedly devoted significant resources to establishing the BREEZE marks and the BREEZE trade dresses such that customers could instantly recognize and associate with Breeze Smoke.  ECF No. 1, PageID.21 at ¶ 43.

Defendant Speed Wholesale, Inc. is a corporation registered in Illinois, and Defendant MKE Vape Wholesale LLC is a limited liability company registered in Wisconsin; both entities have principal places of business in their registered states.  ECF No. 1, PageID.4 at ¶¶ 33-34.  In or around August 2023, Breeze Smoke discovered that Defendant Speed Wholesale was marketing and selling a disposable vaping product called "FREEZE BAR" ("Infringing Product") using a product design and packaging that is nearly identical to the BREEZE trade dresses.  ECF No. 1, PageID.26 at ¶ 58.  Breeze Smoke also confirmed in or around September 2024, that Defendant MKE had begun marketing, promoting, advertising, offering, distributing, and selling

the Infringing Products.  *Id.* at ¶ 59.  The Infringing Products allegedly

compete with Breeze Smoke's BREEZE products because the Infringing

Products are sold to the same customers using a virtually identical

mark, "FREEZE BAR," in a virtually identical stylization as the

BREEZE marks.  ECF No. 1, PageID.31 at ¶¶ 61-66.

Breeze Smoke allegedly sent cease and desist letters to

Defendants demanding that they stop marketing, offering, and selling

the Infringing Products, yet Defendants never responded to the letters.

ECF No. 1, PageID.36 at ¶ 76; *see also* Exhibit I to ECF No. 1.

Defendants have not ceased selling or offering to sell the Infringing

Products and continue to manufacture and market the Infringing

Products.  ECF No. 1, PageID.36 at ¶ 76.  After receiving no response

from Defendants and observing Defendants' continuing production and

sales of the Infringing Products, Breeze Smoke filed the complaint on

January 17, 2025 to stop the promotion, offer, and sale of the Infringing

Products.  *Id.* at ¶ 78.

Breeze Smoke seeks permanent injunction to enjoin Defendants

from further infringement of BREEZE marks and BREEZE trade

dresses.  ECF No. 1, PageID.50.  Breeze Smoke also requests an order

requiring Defendants to pay attorney's fees and costs associated with the lawsuit, along with "gains, profits, and advantages derived from their violation." *Id.* at PageID.52.

## III.   STANDARD OF REVIEW

"Entry of default and a default judgment are distinct events that require separate treatment." *Ramada Franchise Sys., Inc. v. Baroda Enters., LLC*, 220 F.R.D. 303, 304 (N.D. Ohio 2004) (internal citation omitted).  An entry of default is a prerequisite to a default judgment. Pursuant to Fed. R. Civ. P. 55(a), "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default."  An entry of default "conclusively establishes every factual predicate of a claim for relief." *Thomas v. Miller*, 489 F.3d 293, 299 (6th Cir. 2007) (citing *Harmon v. CSX Transp.*, 110 F.3d 364, 368 (6th Cir. 1997)).  However, entry of a default does not establish damages. *See Antoine v. Atlas Turner, Inc.*, 66 F.3d 105, 110 (6th Cir. 1995); *see also Kelley v. Carr*, 567 F. Supp. 831, 841 (W.D. Mich. 1983) ("A default judgment on well-pleaded allegations

establishes only defendant's liability; plaintiff must still establish the
extent of damages.")

Default judgment is governed by Fed. R. Civ. P. 55(b)(2).  On entry
of default, the well-pleaded allegations of the complaint relating to a
defendant's liability are taken as true, with the exception of the
allegations as to the amount of damages.  *Thomas*, 489 F.3d at 299; *see
also Kelley*, 567 F. Supp. at 840.  Thus, the plaintiff is required to
provide proof of all damages sought in the complaint.  *See John E.
Green Plumbing and Heating Co., Inc. v. Turner Constr. Co.*, 742 F.2d
965, 968 (6th Cir. 1984) ("We recognize that the law 'does not require
impossibilities' when it comes to proof of damages, but it does require
whatever 'degree of certainty tha[t] the nature of the case admits.'")
(internal citations omitted).  Fed. R. Civ. P. 55(b)(2) allows courts to
conduct hearings in order to "determine the amount of damages" so it
may effectuate a judgment.

## IV.   ANALYSIS

### A.    Default As to Liability

Because a default has been entered, all of Plaintiff's well-pleaded

allegations, except those relating to damages, are deemed to be admitted.  The facts must still be "sufficient to support a finding of liability as to each defendant." *Ford Motor Co. v. Cross*, 441 F. Supp. 2d 837, 848 (E.D. Mich. 2006).  "In other words, the complaint must be able to survive a Rule 12(b)(6) motion to dismiss." *Howard v. Dearborn Motors 1, LLC*, No. 17-12724, 2020 U.S. Dist. LEXIS 45175, at *9 (E.D. Mich. Mar. 16, 2020).  Plaintiff alleges the following causes of action: trademark infringement (Count I), trade dress infringement (Count II-III), unfair competition and false designation of origin (Count IV) under the Lanham Act, 15 U.S.C. § 1051 *et seq*., unfair competition under Michigan law (Count VI), and unjust enrichment (Count VII).[1]

### 1)   Count I: Federal Trademark Infringement of a Registered Mark

The Lanham Act provides a federal cause of action for infringement of federally registered and unregistered trademarks and trade dresses.  15 U.S.C. §§ 1114(a), 1125; *see also Matal v. Tam*, 582 U.S. 218, 225 (2017).  To prevail on its claims for infringement of trademarks under § 1114 of the Lanham Act, a plaintiff must establish

---

[1] Plaintiff's complaint skips Count V and proceeds directly from Count IV to Count VI.

(1) that it owns the registered trademark, (2) that the infringer used the mark in commerce without authorization, and (3) that use of the alleged infringing mark is likely to cause confusion among consumers regarding the origins of the goods. *AWGI, LLC v. Atlas Trucking Company, LLC*, 998 F.3d 258, 264 (6th Cir. 2021).

        i.     Plaintiff Has Valid Ownerships of Trademarks.

Registration of a trademark is prima facie evidence of the mark's validity and the registrant's ownership and exclusive right to the mark. 15 U.S.C. § 1115(a); *see also Iancu v. Brunetti*, 588 U.S. 388, 391 (2019). Plaintiff demonstrated in the complaint that it owns numerous United States Trademark Applications for its BREEZE marks. ECF No. 1, PageID.9 at ¶ 20; *see also* Exhibit A to ECF No. 1. Plaintiff also identified infringement of the following trademarks: federally registered trademark numbers 6,296,004, 6,296,005, and 7,561,762 for the mark BREEZE, 6,770,534 for the mark BREEZE PLUS, 6,976,563 for the mark BREEZE SMOKE, 6,992,438 for the mark BREEZE PRO, and 7,552,704 for the mark BREEZE ODOR. ECF No. 1, PageID.37 at ¶ 81. Once the party shows ownership of the trademark, the opposing party has the burden to show "prior appropriation and continued use of [a]

mark." *Allard Enterprises, Inc. v. Advanced Programming Resources, Inc.*, 146 F.3d 350, 356 (6th Cir. 1998).  By defaulting, Defendants failed to carry this burden, and Plaintiff thus established ownership of its BREEZE marks.

> ii.   Defendants Used Plaintiffs' Marks in Commerce Without Authorization

The threshold for whether the mark is used in commerce is low. Even "extremely minimal" commercial activity, such as providing a link to a third-party website that sells goods or provides services, can trigger liability. *Taubman Co. v. Webfeats*, 319 F.3d 770, 775 (6th Cir. 2003); *see also Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc.*, 453 F.3d 377, 381 (6th Cir. 2006) ("[W]e can think of no clearer 'use' of goods 'in commerce' than offering them for sale").  Plaintiff alleges that Defendants are selling Infringing Products bearing infringing trademarks and trade dresses on similar venues where Plaintiff's BREEZE products are sold.  Plaintiff's complaint includes images of Defendants' website that show the Infringing Products on sale.  *See* ECF No.1, PageID.26; Exhibit H to ECF No.1 (customer informing that Speed Wholesale is demanding that customers buy the Infringing

Products along with purchases of the BREEZE products).   Defendants'
default and failure to dispute the facts suffice to state that their
products are used in commerce.

> iii.   Defendants' Use of Alleged Infringement Mark
> and Trade Dresses is Likely to Cause Confusion
> Among Consumers Regarding the Origins of the
> Goods.

The "touchstone of liability" for trademark infringement under 15
U.S.C. § 1114 "is whether the defendant's use of the disputed mark is
likely to cause confusion among consumers regarding the origin of the
goods offered by the parties." *Daddy's Junky Music Stores, Inc. v. Big
Daddy's Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir. 1997).  To
determine whether consumers are likely to be confused, the court
weighs the following eight factors: (1) strength of the marks, (2)
relatedness of goods and services, (3) similarity, (4) evidence of
confusion, (5) marketing channels used, (6) degree that a purchaser
would care, (7) defendant's intent, and (8) likelihood of expansion of the
product lines or services.  *AWGI*, 998 F.3d at 264–65.  Since both
trademarks and trade dress are evaluated under the same likelihood of

confusion test, the court will assess likelihood of confusion for both
BREEZE marks as well as BREEZE trade dresses.

Plaintiff addresses all factors to allege that Defendants' products
likely caused and will continue to cause confusion among consumers.

First, Plaintiff argues that its BREEZE marks and trade dresses
have both conceptual and commercial strength.  Plaintiff supports its
allegations with the fact that consumers recognize both BREEZE marks
and trade dresses originate from Breeze Smoke, that it has spent
significant resources developing and advertising its trademarks and
trade dresses, and that other district courts in Michigan acknowledged
strengths of BREEZE marks and trade dresses.  *See* ECF No. 1,
PageID.17 at ¶29, *Breeze Smoke LLC v. World Wholesale Inc.*, No. 23-
13266, 2024 WL 1699502, at *3 (E.D. Mich. Mar. 18, 2024) (finding that
there is market recognition of Breeze Smoke and its trademarks and
trade dresses).  The first factor (strength of the marks) supports
Plaintiff.

Next, Plaintiff contends that because both parties sell the same
type of product—disposable electronic cigarettes—through similar retail
channels, including gas stations and convenience stores, targeting the

same customer base of adult vape consumers, the second and fifth

factors (relatedness of goods and marketing channels used) tilt in favor

of Plaintiffs.  Based on Defendants' default and admission of these facts,

the court agrees. As to the second factor (relatedness), both marks are

for vaping products sold nationwide, and are related.  *See Detroit Coffee*

*Co., LLC v. Soup For You, LLC*, 396 F. Supp. 3d 754, 769 (E.D. Mich.

2019) (holding that because plaintiffs' and defendants' marks were for

coffee products that were sold nationally and in "direct competition" (i.e.

marketed to the same customer base), their marks were related to each

other).  As to the fifth factor (marketing channels used), less likelihood

of confusion exists where the goods are sold through different avenues

or the parties have different customers.  *AWGI,* 998 F.3d at 267.  If the

products are sold in different places, it is unlikely "a customer would

ever encounter both products" and this factor weighs against a plaintiff.

*Detroit Coffee Co., LLC*, 396 F. Supp. 3d at 772.  Here, though, Plaintiff

has alleged that both BREEZE products and the Infringing Products

are sold to similar customers through online retail websites and in-store

retail to the same set of customers, and the fifth factor thus also favors

Plaintiff.  *See AWGI,* 998 F.3d at 267 (affirming district court's finding

14

that because plaintiffs and defendants both used a website as marketing channel, the fifth factor favored plaintiffs).

Plaintiff further alleges that the appearance of the Infringing Products is almost identical to Breeze Smoke's products.  ECF No. 1, PageID.26 at ¶¶ 58-59.  Marks do not have to be identical to infringe; marks are similar if they would confuse a consumer with a general, vague, or hazy impression or recollection of the mark.  *Wynn Oil Co. v. Am. Way Serv. Corp.*, 943 F.2d 595, 601 (6th Cir. 1991).  Plaintiff states that its BREEZE products and the Infringing Products share the same shape, bodies, and mouthpieces, and are packaged in similarly colored wrap.  ECF No. 1, PageID.26 at ¶ 59; Exhibit G to ECF No. 1. Accordingly, the third factor (similarity) favors Plaintiff.  Plaintiff also asserts that consumers purchasing vape products typically do not exercise a high degree of care.  ECF No. 1, PageID.35 at ¶ 73.  In general, the less care that a purchaser is likely to take in comparing products, the greater the likelihood of confusion.  *Wynn Oil Co.*, 943 F.2d at 602.  "The average customer is likely not to exercise a high degree of care in purchasing relatively inexpensive and fungible products."  *Gray v. Meijer, Inc.*, 295 F.3d 641, 649 (6th Cir. 2002).

15

District courts have also generally assumed that cigarette smokers do not pay extensive attention to details of trademark. *See, e.g., Lorillard Tobacco Co. v. Van Dyke Liquor Mkt., Inc.*, 471 F. Supp. 2d 822, 830 (E.D. Mich. 2007) ("Cigarette buyers use a low degree of care . . . [a] cigarette purchaser naturally would assume that he/she is receiving an authentic cigarette product"). Accordingly, the sixth factor (degree that a purchaser would care) also favors Plaintiff.

Regarding the seventh factor (defendant's intent), Plaintiff alleges that Defendants were fully aware of Breeze Smoke's extensive prior use of the BREEZE marks and BREEZE trade dresses and knowingly marketed, promoted, and sold the Infringing Products despite awareness of Breeze Smoke's prior rights. "[I]ntent need not be proved by direct evidence of intentional copying." *Audi AG v. D'Amato*, 469 F.3d 534, 544 (6th Cir. 2006). Intent may be inferred from circumstantial evidence, such as "the use of a contested mark with knowledge of the protected mark at issue." *Id.* (citation omitted). Here, Plaintiff's allegations that Defendants attempted to associate the sale of Infringing Products with Breeze Smoke's product and that Defendants

did not reply to cease and desist letter support the inference of intent, so the seventh factor leans in favor of Plaintiff.

Finally, Plaintiff alleges that both parties will continue competing in the same market for vaping products.  A strong possibility of either party expanding its business to compete or target the same consumers favors finding that the present use is infringing.  *Gen. Motors Corp. v. Keystone Auto. Indus., Inc.*, 453 F.3d 351, 357-58 (6th Cir. 2006) (citation omitted).  As stated above, Defendants allegedly did not respond to Plaintiff's cease and desist letters and failed to halt its sale of Infringing Products.  Therefore, the eighth factor (likelihood of expansion of either the trademarked or infringing product) favors Plaintiff.

Plaintiff admits that the fourth factor, evidence of actual confusion, remains neutral because Plaintiff does not have actual proof favoring this.  However, given that Defendants defaulted and effectively admitted that seven of the eight factors in the likelihood of confusion test support Plaintiff, the court finds that Defendants' use of Plaintiff's trademarks has caused and will continue to cause confusion among consumers regarding the source and quality of the Defendants'

Infringing Products. A review of images of the infringing products confirms their visual similarity, and thus the finding that they are likely to cause confusion would survive a 12(b)(6) motion. *See* ECF No. 1, PageID.2-3 (side-by-side comparison of trademarked and infringing products). In sum, Plaintiff is entitled to default judgment against Defendants for trademark infringement.

2)   *Count II-III: Federal Trade Dress Infringement*

15 U.S.C § 1125(a) of the Lanham Act creates a civil cause of action for trade dress infringement. To prevail on its claim for the infringement of its trade dresses under § 1125(a), Plaintiff must show that its allegedly infringed trade dresses are: (1) nonfunctional, (2) distinctive in the marketplace such that it indicates the source of the good it dresses, and (3) confusingly similar to the allegedly infringing product design. *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 629 (6th Cir. 2002). For the third element, the analysis adopts the same likelihood of confusion test from the § 1114 analysis. *See id.* at 646 (citing same eight factor test).

18

i.   Plaintiff's BREEZE Trade Dresses are

Nonfunctional

A product design is functional "if it is essential to the use or

purpose of the article or if it affects the cost or quality of the article."

*Inwood Labs, Inc. v. Ives Lab'ys, Inc*., 456 U.S. 844, 850 n.10 (1982).

"Evidence that a product design is purely 'ornamental, incidental, or

arbitrary' can be evidence of an absence of functionality." *Leapers, Inc.*

*v. SMTS, LLC*, 879 F.3d 731, 736 (6th Cir. 2018) (quoting *TrafFix*

*Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 30 (2001)).  Whether a

trade dress is nonfunctional is a factual question.  *See Leapers, Inc.*, 879

F.3d at 738.

Plaintiff asserts that its packaging and product design trade

dresses are nonfunctional because they are not essential to the use or

purpose of the product and purely ornamental.  ECF No. 1, PageID.21

at ¶¶ 41-42, PageID.24 at ¶¶ 50-51.  For aesthetic features like

packaging, if "comparable alternatives" are available for competitors to

use to compete in the market, then the feature is not functional.

*Abercrombie & Fitch*, 280 F.3d at 642.  Plaintiff attached images of

other products and packaging designs to argue that there are limitless

19

alternatives to designing vape products.  *See* Exhibits D and F to ECF

No. 1.  Because Defendants do not dispute this, Defendants admit that

Plaintiff's BREEZE trade dresses are nonfunctional.

### ii.    Plaintiff's Trade Dresses Are Distinctive

A trade dress could acquire distinctiveness in two ways.  First, a

trade dress could be "inherently distinctive" if its "intrinsic nature

serves to identify a particular source."  *Two Pesos v. Taco Cabana, Inc.*,

505 U.S. 763, 768 (1992).  Trade dresses that are arbitrary, fanciful, or

suggestive will likely be inherently distinctive (such as "Lucky Strike"

cigarettes, "Kodak" film, and "Tide" detergent), whereas those that are

descriptive and generic will not be inherently distinctive ("soap" or "Soft

Soap").  *Am. Eagle Outfitters*, 280 F.3d at 635-36.  For packaging trade

dresses, "[s]ince the choices that a producer has for packaging are . . .

almost unlimited, typically a trade dress will be arbitrary or fanciful

and thus inherently distinctive."  *Mexican Food Specialties v. Festida

Foods, Ltd.*, 953 F. Supp. 846, 850 (E.D. Mich. 1997) (citation omitted).

Second, a trade dress could acquire distinctiveness by showing

attachment of a secondary meaning (such as if consumers recognize

"Soft Soap" as a product of a certain manufacturer).  *Am. Eagle*

*Outfitters*, 280 F.3d at 635.  To show secondary meaning, Plaintiff could identify evidence demonstrating that "in the minds of the public, the primary significance of a [mark or dress] is to identify the source of the product rather than the product itself."  *Inwood Labs*, 456 U.S. at 851 n.11.

Plaintiff claims that its packaging trade dress is inherently distinctive because it is a unique combination of its wraparound label and rectangular box that serves beyond descriptive and generic purposes.  ECF No. 19, PageID.685.  Plaintiff also alleges that its packaging and product design trade dresses contain secondary meaning because 1) "consumers understand that the Breeze Smoke [t]rade [d]ress emanates exclusively from Breeze Smoke", 2) "third-party retailers also frequently praise the Breeze Smoke Trade Dress, touting it as a 'new elegant design' and a key selling point for the product,," and 3) Breeze Smoke has repeatedly enforced its trade dress rights against other copycat products.  ECF No. 19, PageID.683.  Defendants did not respond to either assertion and thus admit that Plaintiff's packaging and product design trade dresses are distinctive.

> > iii.    The Infringing Products Are "Confusingly
> >
> > Similar" to Plaintiff's Trade Dresses.

The "confusingly similar" element is in this case identical to the likelihood of confusion test from the trademark infringement analysis. *See Abercrombie & Fitch*, 280 F.3d at 646.  As stated above, Defendant defaulted and admitted that the likelihood of confusion test favors Plaintiff for its trade dresses as well.  Therefore, Plaintiff is entitled to default judgment against Defendants for trade dress infringement.

> > 3)    *Count IV: Federal Unfair Competition and False*
> >
> > *Designation of Origin*

Plaintiff asserts a federal claim of unfair competition and false designation of origin predicated on asserted trademark and trade dresses infringement under 15 U.S.C. § 1125(a).  False designation of origin is a form of unfair competition, so the court will consider Count IV narrowly as a false designation of origin claim.  *See Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*, 78 F.3d 1111, 1123 (6th Cir. 1996) ("false designation is simply a species of unfair competition").  Under the Lanham Act, the same test is used for trademark infringement and false designation of origin: likelihood of confusion.

*Audi AG*, 469 F.3d at 542 (citing *Two Pesos v. Taco Cabana, Inc.*, 505 U.S. 763, 780 (1992)); s*ee also Johnson v. Jones*, 149 F.3d 494, 502 (6th Cir. 1998) ("A Lanham Act claim for false designation of origin must contain two elements: (1) the false designation must have a substantial economic effect on interstate commerce; and (2) the false designation must create a likelihood of confusion").

As outlined above, the facts demonstrating both the Plaintiff's and Defendants' uses of the trademarks and trade dresses in commerce, coupled with the likelihood of confusion resulting from such use, support the conclusion that the Plaintiff has adequately stated a claim for unfair competition under § 1125(a).

4)     *Count VI: Common Law Unfair Competition*

Michigan's Trademark Act, Mich. Comp. Laws § 429.31 et seq., permits plaintiffs to bring common law claims based on trademark infringements and unfair competition.  *Janet Travis, Inc. v. Preka Holdings, L.L.C.*, 856 N.W.2d 206, 276 (Mich. Ct. App. 2014).  Because Michigan's Trademark Act is derived from the Lanham Act, the analysis for state unfair competition claim is identical to the Lanham Act analysis.  *See Geomatrix, LLC v. NSF Int'l*, 82 F.4th 466, 484 (6th

Cir. 2023) (stating that the test for relief for trademark and unfair competition claims under both the Lanham Act and Michigan common law is the same "likelihood of confusion" standard).

Because the court finds that Plaintiff prevails on Counts IV, and Defendants have defaulted, the court also concludes that Plaintiffs also stated a claim for unfair competition in Michigan common law as well.

### 5)   Count VII: Unjust Enrichment

Michigan's common law for unjust enrichment requires Plaintiff to show that "the unjust retention of money or benefits which in justice and equity belong to another." *Tkachik v. Mandeville*, 487 Mich. 38 (2010) (citation omitted).  "The elements of a claim for unjust enrichment are: (1) receipt of a benefit by the defendant from the plaintiff and (2) an inequity resulting to plaintiff because of the retention of the benefit by defendant." *Barber v. SMH (US), Inc.*, 202 Mich. App. 366, 375 (1993).  Plaintiff alleges that by misappropriating Plaintiff's valuable goodwill and reputation through the improper use of the BREEZE Marks and BREEZE trade dresses, Defendants have unjustly retained profit originally belonging to Plaintiff without Plaintiff's permission.  ECF No. 1, PageID.36 at ¶ 75.  Defendants do

24

not dispute this through default, so Plaintiff also stated unjust enrichment claim against Defendants.

### B.    Remedies

Having determined that Plaintiffs are entitled to default judgment against Defendants for trademark and trade dress infringement, the court now turns to the issue of deciding on appropriate remedies for Plaintiff.  Plaintiff seeks damages and a permanent injunction against Defendants to prohibit the sales and advertisement of the Infringing Products.  Originally, Plaintiff demanded attorney's fees of $140,000 ($70,000 per Defendant) under 15 U.S.C. § 1117(a) and also requested the court to treble attorney fees up to $420,000 ($210,000 from each Defendant) under 15 U.S.C. § 1117(a).  ECF No. 19, PageID.669.  After the hearing, and the court indicated that it doubted that treble attorney's fees are available under the statute, Plaintiff amended their request in their supplemental briefs to seek attorney's fees in the amount of $93,924 and trebled damages of up to $450,000, based on actual damages of $150,000.  ECF No. 27, PageID.753.

### 1)    *Permanent Injunction*

25

The Lanham Act permits courts to grant an injunction "according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office' or to prevent the violation of any common law trademark rights." *See* 15 U.S.C. § 1116(a).  A plaintiff seeking a permanent injunction must demonstrate "(1) that it has suffered irreparable injury; (2) [that] there is no adequate remedy at law; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) [that] it is in the public's interest to issue the injunction." *Microsoft v. McGee*, 490 F. Supp. 2d 874, 882 (S.D. Ohio, 2007) (citing *Audi AG,* 469 F.3d at 550).  Irreparable injury "ordinarily follows when a likelihood of confusion or possible risk to reputation appears" from infringement or unfair competition.  *Circuit City Stores, Inc. v. CarMax, Inc.*, 165 F.3d 1047, 1056 (6th Cir. 1999).  In the case of a default judgment, the court need not hold an evidentiary hearing to grant a permanent injunction, because there are no factual issues in dispute. *See Gibson Guitar Corp. v. Paul Reed Smith Guitars, LP*, 423 F.3d 539, 546 (6th Cir. 2005).

26

Given that Defendants defaulted, all four factors favor granting Plaintiff permanent injunction.  Plaintiff plausibly alleges that Defendants' Infringing Products misappropriates Breeze Smoke's reputation and resources spent on its trademarks and trade dresses. Further, Plaintiff contends that no adequate remedy exists other than enjoining Defendants from selling the Infringing Products, as Defendants willfully infringed the trademarks despite receiving cease and desist letters.  This deliberate misconduct, Plaintiff argues, indicates a strong likelihood that Defendants will continue to damage Plaintiff's trademarks and trade dress absent injunctive relief. Granting a permanent injunction would not result in severe hardship to Defendants because they would be ordered to simply comply with Lanham Act, a less onerous obligation compared to Plaintiff's alleged hardship in loss of sales and reputation.  Finally, in the interest of "preventing consumer confusion and deception in the marketplace" and Plaintiff's interest in protecting its trademark and trade dress, it is in the public's interest to issue a permanent injunction.  *McGee*, 490 F. Supp. 2d at 883.  The court therefore finds Plaintiff is entitled to a permanent injunction against Defendants under the Lanham Act.

### 2)   Damages

Well-pleaded allegations in the complaint as to liability are taken as true when a defendant is in default, but not as to damages. *Ford Motor Co. v. Cross*, 441 F. Supp. 2d 837, 848 (E.D. Mich. 2006). "[W]here the damages sought are not for a sum certain, the Court must determine the propriety and amount of the default judgment." *J & J Sports Prods., Inc. v. Rodriguez*, No. 08-1350, 2008 WL 5083149, at *1 (N.D. Ohio Nov. 25, 2008) (citing Fed. R. Civ. P. 55(b)).  Rule 55(b)(2) permits, but does not require, the district court to conduct an evidentiary hearing to determine damages. *Arthur v. Robert James & Assoc. Asset Mgmt., Inc.*, No. 11-460, 2012 WL 1122892, at *1 (S.D. Ohio 2012) (citing *Vesligaj v. Peterson*, 331 F. App'x 351, 354–55 (6th Cir. 2009)). The court may rely on affidavits submitted by plaintiff in support of damages without the need for a hearing. *Arthur,* 2012 WL 1122892, at *2 (citation omitted).

### a.   Attorney Fees

In awarding attorney fees under Lanham Act, "trial judges are given considerable discretion." *Hindu Incense v. Meadows*, 692 F.2d 1048, 1051–52 (6th Cir. 1982).  Courts may grant costs and "in

exceptional cases may award reasonable attorney fees to the prevailing party."  15 U.S.C. § 1117(a).  A case may be considered exceptional if "the infringement was malicious, fraudulent, willful, or deliberate."  *Audi AG*, 469 F.3d at 551 (citation omitted).

Two facts weigh in favor of considering this case exceptional.  First, Defendants had actual notice of its infringing activity through cease-and-desist letters, yet they failed to halt marketing or selling Infringing Products after receiving cease and desist letter and notice of Plaintiff's complaint.  Courts have found that refusing to follow cease-and-desist letters is sufficient to find willful infringement and therefore, an "exceptional" case.  *See, e.g., Noco Co. v. Ko*, No. 1:19-CV-1547, 2021 WL 3725655, at *2 (N.D. Ohio Aug. 23, 2021) (holding that the defendant's continued infringement, despite the plaintiff's cease-and-desist letters, supported a finding of willful and exceptional infringement); *Astra Assocs., Inc. v. Sijora Enters., LLC*, No. 15-14148, 2017 WL 744239, at *7 (E.D. Mich. Feb. 27, 2017) (finding trademark infringement case exceptional where defendant continued to use plaintiff's mark without permission even after receiving cease-and-desist letters).  Second, Defendants failed to respond or appear in this

case.  District courts have found that a failure to appear qualifies as willful infringement, and therefore exceptional.  *See, e.g.*, *Coach v. Goodfellow*, 717 F.3d 498, 505-06 (6th Cir. 2013) (upholding district court's award of attorneys' fees under the Lanham Act when the defendant had actual notice of the infringing activity yet continued to facilitate the activity and also failed to litigate the issue of liability); *Ohio State Univ. v. Skreened Ltd.*, 16 F. Supp. 3d 905, 920 (S.D. Ohio 2014) ("A defendant can be said to be willful when the defendant has ignored actual notice of ongoing infringing activity").

After finding the case to be exceptional, the court must next evaluate whether the attorneys' fees requested by Plaintiff are reasonable.  Courts use the lodestar method to determine an award of reasonable attorneys' fees.  *Imwalle v. Reliance Med. Products, Inc.*, 515 F.3d 531, 551 (6th Cir. 2008).  "In setting an award of attorneys' fees, the district court must first arrive at the lodestar amount by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate."  *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1193 (6th Cir. 1997).  "The key requirement for an award of attorney fees is that the documentation offered in support of

30

the hours charged must be of sufficient detail and probative value to enable the court to determine with a high degree of certainty that such hours were actually and reasonably expended in the prosecution of the litigation." *Imwalle*, 515 F.3d at 553.  District courts are required to give a clear explanation for its award calculation.  *Moore v. Freeman*, 355 F.3d 558, 566 (6th Cir. 2004).  Plaintiff seeks $93,923.86 in reasonable attorney fees and costs for 161.8 billable hours worked on this case.  ECF No. 27, PageID.741.  The court finds that the hourly rates of the attorneys and the hours spent are reasonable.

First, the court agrees that an hourly rate of each attorney listed in the calculation is reasonable.  In general, "the 'prevailing market rate' is that rate which lawyers of comparable skill and experience can reasonably expect to command within the venue of the court of record." *Adcock–Ladd v. Secretary of Treasury,* 227 F.3d 343, 350 (6th Cir. 2000).  Plaintiff seeks $550 to $680 per hour for attorney Mary A. Hyde, a lead partner of this lawsuit with over sixteen years of experience, $600 to $685 per hour for attorney Rachel M. Hofstatter, a lead partner with over twenty years of experience, $560 to 625 per hour for attorney Yafeez S. Fatabhoy, an associate with seven years of

31

experience, and $425 to $575 per hour for Amanda M. Blackburn, an associate with over seven years of experience.  ECF No. 27, PageID.745. Plaintiff's counsels assert that these rates are consistent with hourly rates of other intellectual property and commercial lawyers in the states that they are located with comparable years of experience.  ECF No. 27, PageID.743.  They attached the 2023 State Bar of Michigan Economic of Law Survey ("Survey"), that details Michigan lawyers' billing rates, to explain why these rates are reasonable.  *See* Exhibit A to ECF No. 30.  They argue that Plaintiff's counsel's rates are "reasonable given these attorneys' respective experience levels and for the geographic locations and areas of law in which they practice."   ECF No. 30, PageID.796 at ¶ 14.

"District courts have relied on the State Bar of Michigan [] Economics of Law Practice Survey to determine average billing rates in Michigan, and the Sixth Circuit has approved this practice."  *O'Connor v. Trans. Union, LLC.*, No. 05-cv-74498, 2008 WL 4910670 at *5 (E.D. Mich. Nov. 13, 2008).  After reviewing the Survey and the attorney's hourly rates over the past two years, the court finds the hourly rates of Plaintiff's counsels to be reasonable.  Over the two-year duration of this

32

litigation, the average hourly rates for Attorneys Hyde, Hofstatter, Fatabhoy, and Blackburn were $608.33, $643.33, $592.50, and $500, respectively.  All four hourly rates fall within 75th to 95th percentile of hourly billing rates for attorneys practicing intellectual property law in Michigan.  *See* ECF No. 30-1, PageID.808.  The hourly rates for attorneys Hyde and Hofstatter who are practicing in the Chicago and Washington, D.C. offices, respectively, fall within 75th to 95th percentile of hourly billing rates for out-of-state attorneys.  *See* ECF No. 30-1, PageID.807.  The hourly rates for attorneys Fatabhoy and Blackburn who are both practicing in the Ann Arbor offices, respectively, fall within 75th to 95th percentile of hourly billing rates for attorneys practicing in Ann Arbor area.  *See* ECF No. 30-1, PageID.807.  Furthermore, assuming the 161.8 hours billed by the attorneys are reasonable, the resulting average hourly rate of $580.48 per attorney falls within the 75th to 95th percentile of hourly billing rates for intellectual property attorneys in Michigan.  In light of other district courts having approved comparable rates for attorneys with similar experience, the court finds that none of the hourly rates are excessive.  *See, e.g.*, *Fed. Nat'l Mortg. Ass'n v. River Houze, LLC,* No. 21-

cv-10958, 2023 WL 3994355, at *3 (E.D. Mich. June 14, 2023) (finding an attorney's hourly rate below the 95th percentile for all relevant metrics included in the State Bar of Michigan Survey was reasonable); *Meyer v. Mittal*, No. 3:21-cv-00621-HZ, 2025 WL 654075 at *5 (D. Or. Feb. 28, 2025) (finding an attorney's hourly rate between the median and the 95th percentile for relevant metrics included in the Oregon State Bar Economic Survey was reasonable).

Second, the court finds that the time spent from each attorney is reasonable. When determining the reasonable number of hours worked, "the standard is whether a reasonable attorney would have believed the work to be reasonably expended in pursuit of success at the point in time when the work was performed." *Wooldridge v. Marlene Indus. Corp.*, 898 F.2d 1169, 1177 (6th Cir. 1990). Plaintiff's counsel submitted an itemized timesheet of the hours billed. *See* Exhibit 2 to ECF No. 28. They claim that a total of 161.8 billable hours was spent on this case. After reviewing the submitted timesheets, the court finds that the hours Plaintiff's counsels billed for this case are reasonable. Therefore, the court will award the attorney's fees of $93,924.

b.    Plaintiff's Lost Profits

Under 15 U.S.C. § 1117, parties harmed by trademark or trade

dress infringement may pursue a range of monetary remedies.  §

1117(a) states that plaintiffs "shall be entitled . . . subject to the

principles of equity, to recover (1) defendant's profits, (2) any damages

sustained by the plaintiff, and (3) the costs of the action."  15 U.S.C. §

1117(a).[2]  If the court finds that the amount of recovery from profits is

inadequate, "the court may in its discretion enter judgment for such

sum as the court shall find to be just."  *Id.*  That discretion includes the

possibility of awarding "any sum above the amount found as actual

damages, not exceeding three times such amount."  *Id.*  The district

---

[2] 15 U.S.C. § 1117(a) states: "When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, a violation under section 1125(a) or (d) of this title, or a willful violation under section 1125(c) of this title, shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty. The court in exceptional cases may award reasonable attorney fees to the prevailing party."

35

court's goal is "to make violations of the Lanham Act unprofitable to the infringing party." *Wynn Oil Co. v. Am. Way Serv. Corp.*, 943 F.2d 595, 606 (6th Cir. 1991) (quoting *Roulo v. Russ Berrie & Co.*, 886 F.2d 931, 941 (7th Cir. 1989)).

District courts are permitted to exercise this discretion for a compensatory reason, such as "a concern that the award does not encompass the defendant's full profits" or the defendant's active engagement that prevents the plaintiff from identifying its total infringing sales. *Max Rack, Inc. v. Core Health & Fitness, LLC,* 40 F.4th 454, 473 (6th Cir. 2022). Districts courts may not enhance damage for punitive reasons. *Id.* In applying "the principles of equity," 15 U.S.C. § 1117(a), the court considers several factors including, among other considerations, "the defendant's intent to deceive, whether sales were diverted, [and] the adequacy of other remedies." *La Quinta Corp. v. Heartland Properties LLC*, 603 F.3d 327, 343 (6th Cir. 2010).

When a plaintiff seeks lost profit from defendants, "it is not the plaintiff's burden to prove the [defendant's] profits with exactness." *Wynn Oil Co. v. Am. Way Serv. Corp.*, 943 F.2d 595, 605 (6th Cir. 1991). "A plaintiff need only show that its damages calculation is a fair and

36

reasonable approximation of its lost profits." *Merck Eprova AG v. Brookstone Pharms., LLC*, 920 F. Supp. 2d 404, 428 (S.D. N.Y. 2013) (quotation omitted). As long as a plaintiff satisfies their burden to show some suggested number, "courts may engage in some degree of speculation in computing the amount of damages, particularly when the inability to compute them is attributable to the defendant's wrongdoing." *Grp. One Ltd. v. GTE GmbH*, 625 F. Supp. 3d 28, 78 (E.D. N.Y. 2022) (internal quotation and citation omitted, emphasis omitted); *see also Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*, 316 U.S. 203, 206-207 (1942) ("The burden is the infringer's to prove that his infringement had no cash value in sales made by him. If he does not do so, the profits made on sales of goods bearing the infringing mark properly belong to the owner of the mark. There may be a windfall to the trade-mark owner where it is impossible to isolate the profits which are attributable to the use of the infringing mark. But to hold otherwise would give the windfall to the wrongdoer."); *Wynn Oil Co.*, 943 F.2d at 606 (collecting cases, and finding district court abused its discretion by not awarding damages for lost profits even when the district court had found the figure Plaintiffs provided was "uncertain");

*Brunswick Corp. v. Spinit Reel Co.*, 832 F.2d 513, 526 (10th Cir. 1987)

("A defendant [infringer] whose wrongful conduct has caused the

difficulty in assessing damages cannot complain that the damages are

somewhat speculative.").  In other words, courts agree that the fact that

Defendants defaulted cannot operate to their advantage.  *See Foxmind*

*Can. Enters. v. YoYo Lip Gloss, Inc.*, No. 22-CV-5349, 2025 WL 819867,

at *9 (E.D.N.Y. Mar. 15, 2025) (defendant's "default has deprived

plaintiff of any opportunity to fully ascertain the extent of the profits

that defendant realized"); *Taylor Made Golf Co. v. Carsten Sports*, 175

F.R.D. 658, 663 (S.D. Cal. 1997) ("It does not seem unreasonable to ask

whether relaxed standards of proof should be available to trademark

holders trying to establish the profits of defendants who refuse to

respect the summons of a United States court or who are entirely

uncooperative."); *Polo Fashions, Inc. v. Rabanne*, 661 F. Supp. 89, 97

(S.D. Fla. 1986) ("When a party frustrates proof of damages, either by

withholding facts or through inaccurate recordkeeping, any doubts

about the actual assessment of damages will be resolved against that

party, and the factfinder may calculate damages at the highest

reasonably ascertainable value.") (quoting *Chesa International, Ltd. v.*

38

*Fashion Associates, Inc.*, 425 F. Supp. 234, 238 (S.D.N.Y. 1977), *aff'd*,
573 F.2d 1288 (2d Cir. 1977)).

The statute also builds in the ability to make rough guesses as to
what constitutes just compensation: "If the court [] find[s] that the
amount of the recovery based on profits is [] inadequate . . . the court
may in its discretion enter judgment for such sum as the court shall
find to be just, according to the circumstances of the case.  Such sum in
either of the above circumstances shall constitute compensation and not
a penalty."  15 U.S.C. § 1117(a); *see Story Parchment Co. v. Paterson
Parchment Paper Co.*, 282 U.S. 555, 563 (1931) ("It will be enough if the
evidence show [sic] the extent of the damages as a matter of just and
reasonable inference, although the result be only approximate.  The
wrongdoer is not entitled to complain that they cannot be measured
with the exactness and precision that would be possible if the case,
which he alone is responsible for making, were otherwise.").

Plaintiff estimated its lost profit from Defendants' Infringing
Products to be $150,000.  The estimate is supported by the claims that
1) an estimate of 50,000 units of the Infringing Products were sold, and
2) each unit generates $3 profit margin.  According to the declaration of

39

Plaintiff's Managing Member, who alleges to have "familiarity with experience as a nationwide distributor of vaping product," Plaintiff made test purchases of Defendants' Infringing Products after sending cease and desist letters to them, and Defendants could easily and immediately fulfill orders for over a hundred units of Infringing Products in multiple different flavors.  ECF No. 29, PageID.789 at ¶ 8, PageID.790 at ¶ 12.  The Managing Member also states that wholesalers typically purchase vape pen boxes by the pallet load, where one pallet contains between 6,000 to 10,000 units.  ECF No. 29, PageID.790 at ¶ 11.  Given that Plaintiff's BREEZE products have more than dozens of flavors, and that Defendants could satisfy purchase orders of Infringing Products with identical flavors as BREEZE products, the court finds that it is reasonable to infer that 1) Defendants' Infringing Products have identical flavors as Plaintiff's BREEZE products and 2) Defendants have at least one pallet per flavor to satisfy these orders.  From these inferences, the court concludes that Plaintiff's estimate of 50,000 units sold by Defendants is reasonable. Additionally, the $3 profit per unit is adequately supported by reasonable factual allegations that a typical distributor profit margin is

40

50% and that Plaintiff purchased Defendants' Infringing Products at $6 per unit. *Id.* at ¶ 13. Accordingly, multiplying the $3 profit per unit by the estimated 50,000 units of Infringing Products yields a reasonable estimate of $150,000 in total profit likely earned by Defendants.

Finally, trebling these actual damages is appropriate in light of "the principles of equity," which involves consideration of several factors including "the defendant's intent to deceive, whether sales were diverted, [and] the adequacy of other remedies." *La Quinta Corp.,* 603 F.3d at 343. Defendants knowingly and deliberately infringed upon Plaintiff's registered trademarks, even after receiving multiple cease-and-desist letters from Plaintiff. Defendants' failure to appear at any stage of the litigation demonstrates their unwillingness to participate in the calculation of Plaintiff's substantial lost profits and their intent to unjustly enrich from the infringement. As a result, "Defendants' profits are unknown but could amount to hundreds of thousands or even millions of dollars." ECF No. 19, PageID.693. In the interest of compensating an injured Plaintiff who cannot accurately calculate its lost profits, the court finds that trebling damages of $150,000 up to

$450,000 rightfully compensates Plaintiff and does not serve punitive purpose against Defendants.

## V.    CONCLUSION

For the reasons stated above, the Court (1) **GRANTS** the motion for default judgment with respect to Plaintiff's claims of trademark infringement, trade dress infringement, and unfair competition under the Lanham Act and unfair competition and unjust enrichment under the Michigan common law; (2) **GRANTS** Plaintiff's motion for a permanent injunction; (3) and awards damages as follows: pursuant to 15 U.S.C. § 1117(a), Plaintiff is awarded attorney fees of $93,924 and trebled actual damages of $450,000.

**SO ORDERED**.


Date: August 8, 2025                    s/F. Kay Behm
                                        F. Kay Behm
                                        United States District Judge